**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| TOWN OF HARRIETSTOWN, NEW YORK,<br><br>               Plaintiff,<br><br>v.<br><br>3M COMPANY (f/k/a MINNESOTA MINING AND MANUFACTURING CO.), TYCO FIRE PRODUCTS L.P. Successor-In-Interest to the ANSUL COMPANY, BUCKEYE FIRE EQUIPMENT COMPANY, CHEMGUARD, INC., RAYTHEON TECHNOLOGIES CORPORATION (f/k/a United Technologies Corporation), KIDDE-FENWAL, INC., CARRIER GLOBAL CORPORATION, DYNEON LLC, AMEREX CORPORATION, NATIONAL FOAM, INC., E.I. DU PONT DE NEMOURS AND COMPANY, THE CHEMOURS COMPANY, THE CHEMOURS COMPANY FC, LLC, CORTEVA INC., BASF CORPORATION, DYNAX CORPORATION, CLARIANT CORPORATION, JOHN DOE "1" THROUGH "100", JANE DOE "1" THROUGH "100", JOHN DOE CORPORATIONS "1" THROUGH "100", and OTHER JOHN DOE ENTITIES "1" THROUGH "100",<br><br>               Defendants. | Civil Action No.   8:21-CV-0284 (MAD/DJS)<br><br>**NOTICE OF REMOVAL**<br><br>**JURY TRIAL DEMANDED** |

Defendants Tyco Fire Products, LP ("Tyco") and Chemguard, Inc. ("Chemguard"), by and through undersigned counsel, hereby give notice of removal of this action, pursuant to 28 U.S.C. §§ 1442(a)(1) and 1446, from the Supreme Court of the State of New York, County of Franklin, to the United States District Court for the Northern District of New York. As grounds for removal, Tyco and Chemguard state as follows:

**PRELIMINARY STATEMENT**

1.      Plaintiff seeks to hold Tyco, Chemguard, and certain other Defendants liable based in part on their alleged conduct in designing, manufacturing, and selling firefighting chemical

agents, aqueous film-forming foam ("AFFF"), which were developed for sale to the United States military and others in accordance with the military's rigorous specifications ("MilSpec AFFF"). One potential source of the AFFF that has allegedly caused Plaintiff's injuries is the Adirondack Regional Airport (the "Airport"), a "Part 139" civilian airport that is required by law to stock and use MilSpec AFFF. Accordingly, Tyco and Chemguard intend to assert the federal "government contractor" defense in response to Plaintiff's claims. Under the federal officer removal statute, 28 U.S.C. § 1442(a)(1), Tyco and Chemguard are entitled to remove this action in order to have their federal defense adjudicated in a federal forum. Such removal "fulfills the federal officer removal statute's purpose of protecting persons who, through contractual relationships with the Government, perform jobs that the Government otherwise would have performed." *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 133 (2d Cir. 2008).

## BACKGROUND

2.      This action was filed on February 1, 2021, in the Supreme Court of the State of New York, County of Franklin, bearing Index No. E2021-82. (Ex. A, Summons and Complaint). Venue is proper in this Court pursuant to 28 U.S.C. §§ 112(a) and 1441(a) because the Supreme Court of the State of New York, County of Franklin, is located within the Northern District of New York.

3.      On February 9, 2021, Tyco and Chemguard were served with the initial Summons and Complaint (Ex. A). There have been no further proceedings in this action in the Supreme Court of the State of New York, County of Franklin.

4.      Tyco and Chemguard are not required to notify or obtain the consent of any other Defendant in this action in order to remove Plaintiff's action as a whole under § 1442(a)(1). *See, e.g.*, *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1253 (9th Cir. 2006); *Linden v. Chase*

2

*Manhattan Corp.*, No. 99 Civ. 3970(LLS), 1999 WL 518836, at *1 (S.D.N.Y. July 21, 1999); *Torres v. CBS News*, 854 F. Supp. 245, 246 n.2 (S.D.N.Y. 1994).

5.      Plaintiff generally alleges that Defendants, including Tyco and Chemguard, have manufactured, marketed, promoted distributed, and/or sold products, including AFFF products, containing per- and polyfluoroalkyl substances ("PFAS"), including perfluorooctane sulfonate ("PFOS"), perfluorooctanoic acid ("PFOA"), and/or their precursors.  (Compl. ¶¶ 4, 29–31, 115–118).  Plaintiff alleges that these products were stored and used at the Airport, which it owns and operates along with various properties surrounding the Airport.  (*Id.* ¶¶ 4, 7–9, 156–157).  Plaintiff further alleges that the storage and use of AFFF products resulted in contamination of soil, groundwater, surface water, wildlife, and biota at and around the Airport. (*Id.* ¶¶ 139–141, 143, 148).

6.      Plaintiff asserts claims for negligence (*id.* ¶¶ 159–167), strict liability for ultra-hazardous activity (*id.* ¶¶ 168–177), strict liability for defective design (*id.* ¶¶ 178–188), strict products liability for failure to warn (*id.* ¶¶ 189–198), public nuisance (*id.* ¶¶ 199–205), trespass (*id.* ¶¶ 206–213), restitution/unjust enrichment (*id.* ¶¶ 214–218), and contribution (*id.* ¶¶ 219–224).

7.      Pursuant to 28 U.S.C. § 1446(d), a copy of this Notice of Removal is being served upon counsel for Plaintiff and a copy is being filed with the Clerk of the Supreme Court of the State of New York, County of Franklin.

8.      By filing a Notice of Removal in this matter, Tyco and Chemguard do not waive the rights of any Defendant to object to service of process, the sufficiency of process, jurisdiction over the person, or venue; and Tyco and Chemguard specifically reserve the rights of all Defendants to assert any defenses and/or objections to which they may be entitled.

9. Tyco and Chemguard reserve the right to amend or supplement this Notice of Removal.

10. If any question arises as to the propriety of the removal of this action, Tyco and Chemguard request the opportunity to present a brief and oral argument in support of removal.

## REMOVAL IS PROPER UNDER THE FEDERAL OFFICER REMOVAL STATUTE, 28 U.S.C. § 1442(a)(1)

11. Removal here is proper under 28 U.S.C. § 1442(a)(1), which provides for removal when a defendant is sued for acts undertaken at the direction of a federal officer. Removal is appropriate under this provision where the removing defendant establishes that: "(a) it is a 'person' within the meaning of the statute; (b) there is a causal nexus between its actions, taken pursuant to a federal officer's directions, and plaintiff's claims; and (c) it can assert a 'colorable federal defense.'" *Durham*, 445 F.3d at 1251; *see also Mesa v. California*, 489 U.S. 121, 124–25, 129–31, 133–35 (1989); *Cuomo v. Crane Co.*, 771 F.3d 113, 115 (2d Cir. 2014); *Bennett v. MIS Corp.*, 607 F.3d 1076, 1085 (6th Cir. 2010); *Isaacson*, 517 F.3d at 135.

12. Removal rights under the federal officer removal statute, 28 U.S.C. § 1442, are much broader than under the general removal statute, 28 U.S.C. § 1441. Suits against defendants acting on behalf of federal officers "may be removed despite the nonfederal cast of the complaint; the federal-question element is met if the defense depends on federal law." *Jefferson County v. Acker*, 527 U.S. 423, 431 (1999). This is because § 1442 protects "the government's need to provide a federal forum for its officers and those who are 'acting under' a federal office." *Albrecht v. A.O. Smith Water Prods.*, No. 11 Civ. 5990(BSJ), 2011 WL 5109532, at *3 (S.D.N.Y. Oct. 21, 2011) (citation omitted). This important federal policy "should not be frustrated by a narrow, grudging interpretation of [§] 1442(a)(1)." *Willingham v. Morgan*, 395 U.S. 402, 407 (1969); *see Durham*, 445 F.3d at 1252. To the contrary, § 1442 as a whole must be "liberally construe[d]" in

favor of removal.  *Papp v. Fore-Kast Sales Co.*, 842 F.3d 805, 812 (3d Cir. 2016) (alterations in original) (internal quotation marks omitted).

       13.     All requirements for removal under § 1442(a)(1) are satisfied here.  *See*, *e.g.*, *Ayo v. 3M Co.*, No. 18-CV-0373(JS)(AYS), 2018 WL 4781145 (E.D.N.Y. Sept. 30, 2018) (denying motion to remand and finding that federal officer removal was proper in case against Tyco, Chemguard, and other manufacturers of AFFF).  In fact, in cases quite similar to this one, the judge overseeing the *In re Aqueous Film-Forming Foams Products Liability Litigation* multi-district litigation ("MDL") has found several times that removal under § 1442 was proper.  *See* Order, *In re Aqueous Film-Forming Foams Products Liability Litigation*, MDL No. 2:18-mn-2873-RMG, ECF. No. 103 (D.S.C. May 24, 2019) ("MDL Order 1") at 3–6 (removal requirements satisfied because Tyco demonstrated that it manufactured AFFF under the guidance of the U.S. military); Order, *In re Aqueous Film-Forming Foams Products Liability Litigation*, MDL No. 2:18-mn-2873-RMG, ECF. No. 320 (D.S.C. Sept. 27, 2019) ("MDL Order 2") at 3–5 (removal requirements satisfied where plaintiff's claims based in part on AFFF use at Part 139 airport); Order, *In re Aqueous Film-Forming Foams Products Liability Litigation*, MDL No. 2:18-mn-2873-RMG, ECF. No. 325 (D.S.C. Oct. 1, 2019) ("MDL Order 3") at 3–6 (same).  Given its experience with the claims and defenses in AFFF litigation, the MDL Court's holdings clearly demonstrate that this case, too, is properly removed to federal court.[1]

**A.**     **MilSpec AFFF**

       14.     Since the 1960s, the United States military has used MilSpec AFFF on military bases, airfields, and Navy ships—settings where fuel fires are inevitable and potentially devastating—to train its personnel, put out fires, save lives, and protect property.  Indeed, the

---

[1] Following removal, Tyco and Chemguard intend to designate this action for transfer to the MDL.

United States Naval Research Laboratory developed AFFF in response to deadly, catastrophic fires aboard the aircraft carriers *USS Forrestal* in 1967 and *USS Enterprise* in 1969.[2] Decades later, the Naval Research Laboratory described the development of AFFF as "one of the most far-reaching benefits to worldwide aviation safety."[3]

15.     The manufacture and sale of MilSpec AFFF is governed by rigorous military specifications created and administered by Naval Sea Systems Command.  The applicable specification, Mil-F-24385, was first promulgated in 1969, and has been revised a number of times since then.[4]  All MilSpec AFFF products must be qualified for listing on the applicable Qualified Products List prior to military procurement.  Prior to such listing, a manufacturer's products are examined, tested, and approved to be in conformance with specification requirements.[5]  The MilSpec designates Naval Sea Systems Command as the agency responsible for applying these criteria and determining whether AFFF products satisfy the MilSpec's requirements.  After a product is added to the Qualified Products List, "[c]riteria for retention of qualification are applied on a periodic basis to ensure continued integrity of the qualification status."[6]  Naval Sea Systems Command reserves the right to perform any of the quality assurance inspections set forth in the specification where such inspections are deemed necessary to ensure supplies and services conform to prescribed requirements.

---

[2] *See* Press Release 71-09r, U.S. Naval Research Lab., Navy Researchers Apply Science to Fire Fighting (Oct. 23, 2009), https://tinyurl.com/y2jq4q4w.

[3] U.S. Navy, NRL/MR/1001--06-8951, The U.S. Naval Research Laboratory (1923–2005): Fulfilling the Roosevelts' Vision for American Naval Power 37 (2006) ("Fulfilling the Roosevelts' Vision"), http://bit.ly/2mujJds.

[4] The 1969 MilSpec and all its revisions and amendments through April 2020 are available at https://tinyurl.com/yxwotjpg.

[5] Dep't of Defense SD-6, Provisions Governing Qualification 1 (Feb. 2014), https://tinyurl.com/y5asm5bw.

[6] *Id.* at 1.

16.    From its inception until very recently, the MilSpec included the express requirement that MilSpec AFFF contain "fluorocarbon surfactants." All fluorocarbon surfactants are PFAS, and that category includes PFOA, PFOS, and their chemical precursors—the very compounds at issue in the Complaint here. This requirement has been in force for virtually the entire time period at issue in the Complaint. And although in 2019 the MilSpec removed the modifier "fluorocarbon" from "surfactants," it expressly states that "the DoD intends to acquire and use AFFF with the lowest demonstrable concentrations of . . . PFOS and PFOA" "[i]n the short term." PFOA or PFOS are unavoidably present at some concentrations in fluorocarbon surfactants, and the current MilSpec expressly contemplates that AFFF formulations will contain PFOA and PFOS (subject to recently imposed limits).

17.    So-called "Part 139" airports are those serving scheduled passenger flights by nine passenger (or larger) aircraft or unscheduled passenger flights by 31 passenger (or larger) aircraft. *See* 14 C.F.R. § 139.1 (2019). The federal government requires Part 139 airports to use MilSpec AFFF. On July 8, 2004, the FAA issued Advisory Circular 150/5210-6D, which stated that "AFFF agents [used by Part 139 airports] must meet the requirements of Mil-F-24385F."[7] Although the preamble indicated that the circular was for guidance only, on February 8, 2006, the FAA issued a CertAlert clarifying that the MilSpec AFFF requirement was, in fact, mandatory and that "[a]ny AFFF purchased after July 1, 2006 by an airport operator certified under Part 139 must meet [Mil-F-24385F]."[8] The FAA explained:

> There are several reasons for this requirement. First of all, AFFF has to be compatible when mixed. AFFF manufactured by different manufacturers, although meeting the UL 162 standard, may not be compatible. AFFF meeting the Military Specification will always

---

[7] *See* Advisory Circular 150/5210-6D at 4, Chapter 6, https://tinyurl.com/yxpk87ky.

[8] *See* DOT/FAA/TC-14/22, Impact of Alternative Fuels Present in Airports on Aircraft Rescue and Firefighting Response at 25–26 (Aug. 2014), https://tinyurl.com/rt35dgp.

> be compatible with other Military Specification AFFF no matter the manufacturer. Second, AFFF meeting the military specification requires less agent than AFFF meeting UL 162 to extinguish the same size fire. Finally, the requirement to use Mil Spec is in concert with the National Fire Protection Association National Fire Code 403, paragraph 5.1.2.1.[9]

18.  On September 1, 2016, the FAA issued a superseding CertAlert, which reiterated that "Airport operators must ensure any AFFF purchased after July 1, 2006, meets Mil-Spec standards."[10] Thus, from July 1, 2006 to present, airport operators holding an FAA Airport Operating Certificate have been required to purchase MilSpec AFFF for use.

19.  Plaintiff "has owned and operated the Airport since approximately 1950" and "also owns various real properties surrounding the Airport." (Compl. ¶¶ 8–9). The Airport is a Part 139 airport[11] and is located in Lake Clear, New York, which is a hamlet within the Town of Harrietstown. (Compl. ¶¶ 1, 6). As a Part 139 airport, the Airport is required to stock and use MilSpec AFFF. Upon information and belief, MilSpec AFFF has been used and released into the environment at the Airport since at least 2006.

20.  Plaintiff alleges that AFFF has been used at the Airport in response to fires and for firefighting training for decades. (*Id.* ¶¶ 131, 138). Plaintiff identifies Chemguard as one of the Defendants that produced the AFFF it used and stored. (*Id.* ¶ 133). Plaintiff alleges that the "[u]se and storage of AFFF produced by the AFFF Manufacturing Defendants has caused contamination of environmental media, including soil, groundwater, surface water, wildlife and biota, at and around the Airport." (*Id.* ¶ 139). Plaintiff further alleges that purported detections of PFOS,

---

[9] *Id.*

[10] Federal Aviation Administration, Cert Alert No. 16-05: Update on Mil-Spec Aqueous Film Forming Foam (AFFF) at 2 (Sept. 1, 2016), https://tinyurl.com/ya5pvbkh.

[11] *See* "Part 139 Airport Certification Status List," available at *https://www.faa.gov/airports/airport_safety/part139_cert/*.

PFOA, and other PFAS near the Airport resulted from contaminated groundwater migrating offsite and impacting surface water bodies, wildlife, and biota. (*Id.* ¶¶ 142–148). Plaintiff asserts that "AFFF use at the Airport constitutes the likely source of the PFAS contamination (including PFOA and PFOS) found in the environmental media." (*Id.* ¶ 149).

**B.      All the Requirements of 28 U.S.C. § 1442(a)(1) Are Satisfied**

**1.      The "Person" Requirement Is Satisfied**

21.    The first requirement for removal under the federal officer removal statute is satisfied here because Tyco (a limited partnership) and Chemguard (a corporation) are "persons" under the statute.   For purposes of § 1442(a)(1), the term "person" includes "companies, associations, firms, [and] partnerships." *Papp*, 842 F.3d at 812 (quoting 1 U.S.C. § 1); *see Bennett*, 607 F.3d at 1085 (concluding that a non-natural entity is a "person" for purposes of § 1442(a)(1)); *Isaacson*, 517 F.3d at 135–36 (same).

**2.      The "Acting Under" Requirement Is Satisfied**

22.    The second requirement ("acting under" a federal officer) is satisfied when an entity assists or helps carry out the duties or tasks of a federal officer. *Isaacson*, 517 F.3d at 137 (internal quotation marks omitted).   "The words 'acting under' are to be interpreted broadly." *Id.* at 136 (citation omitted).   Federal courts "have explicitly rejected the notion that a defendant could only be 'acting under' a federal officer if the complained-of conduct was done at the specific behest of the federal officer or agency." *Papp*, 842 F.3d at 813.

23.    The requirement is met here because Plaintiff's claims, at least in part, challenge Tyco's and Chemguard's alleged conduct in providing vital products "that, in the absence of Defendants, the Government would have had to produce itself." *Isaacson*, 517 F.3d at 137. MilSpec AFFF is a mission critical military and aviation safety product that, without the support of private contractors, the government would have to produce for itself. *See Ayo*, 2018 WL

4781145, at \*9 (describing MilSpec AFFF as a "mission-critical" and "life-saving product" used by all branches of the U.S. armed forces and NATO members) (internal quotation marks omitted); *cf. Isaacson*, 517 F.3d at 137.  The Naval Research Laboratory states that, "[a]lthough [it] was responsible for the original concepts and formulations, it was necessary to elicit the aid of the chemical industry to synthesize the fluorinated intermediates and agents to achieve improvements in formulations."[12]   Accordingly, the military has long depended upon outside contractors like Tyco and Chemguard to develop and supply AFFF.  *See Ayo*, 2018 WL 4781145, at \*8–9 (holding that Tyco, Chemguard, and other AFFF manufacturers were "acting under" a federal officer in connection with the manufacture and sale of MilSpec AFFF); *see also* MDL Order 1 at 3–6 (finding that the "acting under" requirement was satisfied because Tyco demonstrated that it was manufacturing AFFF under the guidance of the U.S. military); MDL Order 2 at 3–5 (same for AFFF used at Part 139 airport); MDL Order 3 at 3–6 (same).  If Tyco, Chemguard, and other manufacturers did not provide MilSpec AFFF for use at Part 139 airports, the government would have to manufacture and provide the product itself.

24.    In designing, manufacturing, and supplying the MilSpec AFFF products at issue, Tyco and Chemguard acted under the direction and control of one or more federal officers. Specifically, Tyco and Chemguard acted in accordance with detailed specifications, promulgated by Naval Sea Systems Command, that govern AFFF formulation, performance, testing, storage, inspection, packaging, and labeling.  Further, the AFFF products in question were subject to various tests by the United States Navy before and after being approved for use by the military and

---

[12] *Fulfilling the Roosevelts' Vision* at 37.

for inclusion on the Qualified Products List maintained by the United States Department of Defense.[13]

### 3. The Causation Requirement Is Satisfied

25. The third requirement, that a defendant's actions were taken "under color of federal office . . . has come to be known as the causation requirement." *Isaacson*, 517 F.3d at 137 (alteration, citation, and internal quotation marks omitted). Like the "acting under" requirement, "[t]he hurdle erected by this requirement is quite low." *Id.* Courts "credit Defendants' theory of the case when determining whether [this] causal connection exists." *Id.*[14]

26. "To show causation, Defendants must only establish that the act that is the subject of Plaintiffs' attack . . . occurred *while* Defendants were performing their official duties." *Isaacson*, 517 F.3d at 137–38. Here, the Plaintiff's claims arise in part from Tyco's and Chemguard's production and sale of AFFF manufactured to military specifications for use in or around the Airport. Plaintiff alleges that the use of PFAS in AFFF is the source of its injury. Tyco and Chemguard contend that the use of such chemicals in MilSpec AFFF was required by military specifications. The conflict is apparent: MilSpec AFFF was developed by Tyco, Chemguard, and other manufacturers to meet specifications established by the Department of Defense. Military installations and Part 139 airports are required to employ MilSpec AFFF. The design choices Plaintiff is attempting to impose via state tort law would create a conflict in which Tyco and Chemguard could not comply with both the MilSpec and the purported state-prescribed duty of care. *See Boyle v. United Techs. Corp.*, 487 U.S. 500, 509 (1988); *see also Ayo*, 2018 WL 4781145, at *9 ("[T]here is evidence of a 'casual connection' between the use of PFCs in AFFF

---

[13] *See* Dep't of Defense, SD-6, at 1.

[14] The "acting under" and "under color of" prongs overlap. Both "are satisfied if the actions subject to suit resulted directly from government specifications or direction." *Albrecht*, 2011 WL 5109532, at *5.

and the design and manufacture of AFFF for the government."); MDL Order 1 at 5–6 ("Here, [Plaintiff]'s claims arise out of use of AFFF products that it claims Tyco manufactured and sold, and for which the U.S. military imposes MilSpec standards. The Court . . . finds that the causation element of federal officer removal is satisfied here."); MDL Order 2 at 5 (finding the causation element of federal officer removal satisfied where Tyco/Chemguard's AFFF products, "for which the military imposes MilSpec standards," were used at several Part 139 airports); MDL Order 3 at 5–6 (same as to MilSpec AFFF used at a single airport).

### 4.     The "Colorable Federal Defense" Requirement Is Satisfied

27.     The fourth requirement ("colorable federal defense") is satisfied by Tyco's and Chemguard's assertion of the government contractor defense.

28.     At the removal stage, a defendant need only show that its government contractor defense is colorable; that is, "that the defense was 'legitimate and [could] reasonably be asserted, given the facts presented and the current law.'" *Papp*, 842 F.3d at 815 (alteration in original) (citation omitted). "A 'defendant need not win his case before he can have it removed.'" *Id.* (quoting *Willingham*, 395 U.S. at 407); *see also Bennett*, 607 F.3d at 1089 ("[A] colorable federal defense need only be plausible . . . [and] a district court is not required to determine its validity at the time of removal.") (internal citation omitted); *Isaacson*, 517 F.3d at 139 ("To be 'colorable,' the defense need not be 'clearly sustainable,' as the purpose of the statute is to secure that the validity of the defense will be tried in federal court.") (citation omitted). At the removal stage, the inquiry "is purely jurisdictional, and neither the parties nor the district courts should be required to engage in fact-intensive motion practice, pre-discovery, to determine the threshold jurisdictional issue." *Crane Co.*, 771 F.3d at 116.[15] Moreover, "this inquiry is undertaken whilst viewing the

---

[15] *See also Kraus v. Alcatel-Lucent*, No. 18-2119, 2018 WL 3585088, at *2 (E.D. Pa. July 25, 2018) ("A court does not 'determine credibility, weigh the quantum of evidence or discredit the source of the

facts in the light most favorable to Defendants." *Hagen v. Benjamin Foster Co.*, 739 F. Supp. 2d 770, 783–84 (E.D. Pa. 2010). "Precisely in those cases where a plaintiff challenges the factual sufficiency of the defendant's defense, the defendant should 'have the opportunity to present [his] version of the facts to a federal, not a state, court.'" *Crane Co.*, 771 F.3d at 116 (alteration in original) (citation omitted); *see also Bennett*, 607 F.3d at 1090–91.

29.     Under the government contractor defense, the defendant is not liable for alleged defects or negligence with respect to military equipment or supplies "when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Boyle*, 487 U.S. at 512.

30.     Tyco and Chemguard have satisfied these elements for purposes of removal. As discussed above, Naval Sea Systems Command approved reasonably precise specifications, governing MilSpec AFFF formulation, performance, testing, storage, inspection, packaging, and labeling. Tyco's and Chemguard's products appeared on the DOD Qualified Products List, which could have happened only if Naval Sea Systems Command had first determined that they conformed to the MilSpec. *See Ayo*, 2018 WL 4781145, at *13 ("[T]here is colorable evidence that Manufacturing Defendants' Mil-Spec AFFF is not a stock product and that the government approved reasonably precise specifications requiring them to use PFCs, including PFOS and PFOA, in their products."); *see also id.* ("There is also colorable evidence … that Manufacturing Defendants' AFFF products conformed to the government's reasonably precise specifications."); MDL Order 1 at 5 (finding Tyco demonstrated a colorable defense "where it contends that its

---

defense' at this stage. Instead, [the court] only determine[s] whether there are sufficient facts alleged to raise a colorable defense.") (internal citation omitted).

AFFF products were manufactured according to the U.S. military's MilSpec specifications"); MDL Order 2 at 4 (same, as to Tyco/Chemguard); MDL Order 3 at 5 (same, as to Tyco/Chemguard).

31.    Moreover, the government was adequately informed regarding alleged product-related "dangers," *Boyle*, 487 U.S. at 512, to exercise its discretionary authority in specifying and procuring MilSpec AFFF.  The military specifications have long included testing protocols and requirements for toxicity, chemical oxygen, and biological demand.  Indeed, it is clear that the United States has long understood that AFFF can contain PFAS and may contain or break down into PFOS and/or PFOA; that AFFF constituents can migrate through the soil and potentially reach groundwater; and that it has been reported that this may raise environmental or health issues.[16]  For example, as early as October 1980, a report supported by the U.S. Navy Civil Engineering Laboratory, U.S. Air Force Engineering Service Center, and the U.S. Army Medical Research and Development Command stated that AFFF contained fluorocarbons and that "[a]ll of the constituents resulting from fire fighting exercises are considered to have adverse effects environmentally."[17]  More recently, in a November 2017 report to Congress, the Department of Defense acknowledged the concerns raised by the EPA regarding PFOS and PFOA.  Nonetheless, it still described AFFF containing PFOS or PFOA as a "mission critical product [that] saves lives and protects assets by quickly extinguishing petroleum-based fires."[18]  Indeed, Naval Sea Systems Command continues to require that MilSpec AFFF contain "surfactants," and recognizes that

---

[16] *See, e.g.*, EPA, Revised Draft Hazard Assessment of Perfluorooctanoic Acid and its Salts, at 1–6 (Nov. 4, 2002) (excerpt).

[17] *See* Edward S. K. Chian et al., *Membrane Treatment of Aqueous Film Forming Foam (AFFF) Wastes for Recovery of Its Active Ingredients* 1 (Oct. 1980), http://www.dtic.mil/dtic/tr/fulltext/u2/a136612.pdf.

[18] Dep't of Defense, Aqueous Film Forming Foam Report to Congress 1–2 (Oct. 2017) (pub. Nov. 3, 2017).

PFAS, including PFOS and PFOA, will be present (subject to recently imposed limits for PFOS and PFOA) in AFFF formulations. *See Ayo*, 2018 WL 4781145, at *12 ("That the DoD knows of the alleged risks of PFC-based AFFF products but continues to purchase them supports the position that the government approved reasonably precise specifications for the claimed defective design."); MDL Order 1 at 5 ("As to whether Tyco adequately informed the U.S. military of dangers associated with its AFFF products of which the military was not already aware, Tyco points to materials such as a November 2017 Department of Defense report to Congress, in which the agency acknowledged the [EPA]'s stated concerns with PFOS/PFOA in drinking water . . . .").

32.    At minimum, these facts constitute colorable evidence that Naval Sea Systems Command "made a discretionary determination" regarding the formulation of MilSpec AFFF after weighing the fire-suppression benefits against the alleged risks. *See Twinam v. Dow Chem. Co. (In re "Agent Orange" Prod. Liab. Litig.)*, 517 F.3d 76, 90 (2d Cir. 2008); *see also Albrecht*, 2011 WL 5109532, at *5 ("A defendant is not required to warn the government where 'the government knew as much or more than the defendant contractor about the hazards of the product.'") (citation omitted). Where, as here, the government has exercised "discretionary authority over areas of significant federal interest such as military procurement," the government contractor defense applies. *In re "Agent Orange" Prod. Liab. Litig.*, 517 F.3d at 89–90; *see also Ayo*, 2018 WL 4781145, at *13.

WHEREFORE, Tyco and Chemguard hereby remove this action from the Supreme Court of the State of New York, County of Franklin, to this Court.

Dated:  March 11, 2021

Respectfully submitted,

ARCHER & GREINER P.C.

By:  _/s/ Thomas J. Herten_
Thomas J. Herten
Court Plaza South, West Wing
21 Main Street, Suite 353
Hackensack, NJ 07601-7095
(201) 498-8502
therten@archerlaw.com

*Counsel for Tyco Fire Products, LP &
Chemguard, Inc.*

220552883v1

# EXHIBIT A

SUPREME COURT FOR THE STATE OF NEW YORK
COUNTY OF FRANKLIN

---

TOWN OF HARRIETSTOWN, NEW YORK,

               Plaintiff,

      -against-

3M COMPANY (f/k/a MINNESOTA MINING AND
MANUFACTURING CO.), TYCO FIRE PRODUCTS L.P.
Successor-In-Interest to the ANSUL COMPANY,
BUCKEYE FIRE EQUIPMENT COMPANY,
CHEMGUARD, INC., RAYTHEON TECHNOLOGIES
CORPORATION (f/k/a United Technologies Corporation),
KIDDE-FENWAL, INC., CARRIER GLOBAL
CORPORATION, DYNEON LLC, AMEREX
CORPORATION, NATIONAL FOAM, INC., E.I. DU
PONT DE NEMOURS AND COMPANY, THE
CHEMOURS COMPANY, THE CHEMOURS COMPANY
FC, LLC, CORTEVA INC., BASF CORPORATION,
DYNAX CORPORATION, CLARIANT CORPORATION,
JOHN DOE "1" THROUGH "100", JANE DOE "1"
THROUGH "100", JOHN DOE CORPORATIONS "1"
THROUGH "100", and OTHER JOHN DOE ENTITIES
"1" THROUGH "100",

               Defendants.

---

Index No.:

**SUMMONS**

Plaintiff designates Franklin
County as the Place for Trial.

The Basis of Venue is
Plaintiff's Place of Business:
39 Main Street
Saranac Lake, NY 12983

Date Index Number Purchased:
February 1, 2021

TO THE ABOVE NAMED DEFENDANTS:

     You are hereby summoned and required to serve upon the Plaintiff's attorneys an answer

to the complaint in this action within twenty (20) days after the service of this summons, exclusive

of the day of service, or within thirty (30) days after service is complete if this summons is not

personally delivered to you within the State of New York. In case of your failure to answer,

judgment will be taken against you by default for the relief demanded in the complaint.

1

Dated:  February 1, 2021
      Melville, New York

                          **RIGANO LLC**
                          *Attorneys for Town of Harrietstown, New York*

                        By: */s/ Nicholas C. Rigano*
                              James P. Rigano, Esq.
                              Nicholas C. Rigano, Esq.
                              538 Broad Hollow Road, Suite 301
                              Melville, New York 11747
                              (631) 756-5900

To:

3M Company (f/k/a Minnesota Mining And Manufacturing Co.)
3M Center
St. Paul, Minnesota 55144

Tyco Fire Products L.P. Successor-In-Interest to the Ansul Company
1400 Pennbrook Parkway
Lansdale, Pennsylvania 19446

Buckeye Fire Equipment Company
110 Kings Road
Kings Mountain, North Carolina 28086

Chemguard, Inc.
One Stanton Street
Marinette, WI 54143

Raytheon Technologies Corp. (f/k/a United Technologies Corporation)
10 Farm Springs Road
Farmington, Connecticut 06032

Kidde-Fenwal, Inc.
400 Main St.
Ashland, Massachusetts 01721

Carrier Global Corporation
13995 Pasteur Boulevard
Palm Beach Gardens, Florida 33418

Dyneon LLC
6744 33rd St. N.,
Oakdale, Minnesota 55128

2

Amerex Corporation
7595 Gadsden Highway
Trussville, Alabama 35173

National Foam Inc.
141 Junny Road,
Angier, North Carolina 27501

E.I. du Pont de Nemours and Company
974 Centre Road
Wilmington, Delaware 19805

The Chemours Company
1007 Market Street
Wilmington, Delaware 19899

The Chemours Company FC, LLC
1007 Market Street
Wilmington, Delaware 19899

Corteva, Inc.
974 Centre Road
Wilmington, Delaware 19805

BASF Corporation
100 Park Avenue
Florham Park, New Jersey 07932

Dynax Corporation
103 Fairview Park Dr.
Elmsford, New York 10523

Clariant Corporation
4000 Monroe Road
Charlotte, North Carolina 28205

SUPREME COURT FOR THE STATE OF NEW YORK
COUNTY OF FRANKLIN

---

TOWN OF HARRIETSTOWN, NEW YORK,

                    Plaintiff,

      -against-

3M COMPANY (f/k/a MINNESOTA MINING AND
MANUFACTURING CO.), TYCO FIRE PRODUCTS L.P.
Successor-In-Interest to the ANSUL COMPANY,
BUCKEYE FIRE EQUIPMENT COMPANY,
CHEMGUARD, INC., RAYTHEON TECHNOLOGIES
CORPORATION (f/k/a United Technologies Corporation),
KIDDE-FENWAL, INC., CARRIER GLOBAL
CORPORATION, DYNEON LLC, AMEREX
CORPORATION, NATIONAL FOAM, INC., E.I. DU
PONT DE NEMOURS AND COMPANY, THE
CHEMOURS COMPANY, THE CHEMOURS COMPANY
FC, LLC, CORTEVA INC., BASF CORPORATION,
DYNAX CORPORATION, CLARIANT CORPORATION,
JOHN DOE "1" THROUGH "100", JANE DOE "1"
THROUGH "100", JOHN DOE CORPORATIONS "1"
THROUGH "100", and OTHER JOHN DOE ENTITIES
"1" THROUGH "100",

                    Defendants.

---

Index No.:

**VERIFIED COMPLAINT**

***Jury Trial Demanded***

Plaintiff designates Franklin
County as the Place for Trial.

The Basis of Venue is
Plaintiff's Place of Business:
39 Main Street
Saranac Lake, NY 12983

---

Plaintiff Town of Harrietstown, New York ("Plaintiff" or "Town") by and through its

attorneys, Rigano LLC, as and for its complaint against Defendants 3M Company (f/k/a

Minnesota Mining And Manufacturing Co.) ("3M"), Tyco Fire Products L.P. Successor-In-

Interest to the Ansul Company ("Tyco"), Buckeye Fire Equipment Company ("Buckeye"),

Chemguard, Inc. ("Chemguard"), Raytheon Technologies Corporation (f/k/a United Technologies

Corporation) ("United Technologies"), Kidde-Fenwal, Inc. ("Kidde"), Carrier Global Corporation

("Carrier"), Dyneon LLC ("Dyneon"), Amerex Corporation ("Amerex"), National Foam Inc.

("National Foam" and together with 3M, Tyco, Buckeye, Chemguard, United Technologies, Kidde, Carrier, Dyneon, Amerex, the "AFFF Manufacturing Defendants"), E.I. du Pont de Nemours and Company ("DuPont"), The Chemours Company, The Chemours Company FC, LLC (together with The Chemours Company, "Chemours"), Corteva, Inc. ("Corteva"), BASF Corporation ("BASF"), Dynax Corporation ("Dynax") and Clariant Corporation ("Clariant" and together with DuPont, Chemours, Corteva, BASF, and Dynax, the "Product Manufacturing Defendants" and Product Manufacturing Defendants collectively with the AFFF Manufacturing Defendants, the "Manufacturing Defendants"),  as well as John Doe "1" through "100", Jane Doe "1" through "100", John Doe Corporations "1" through "100" and Other John Doe Entities "1" through "100" (together, the "Unnamed Defendants" and collectively with the Manufacturing Defendants, the "Defendants"), alleges as follows:

## Nature of the Action

1.     Plaintiff brings this action against Defendants for, among other things: (I) recovery of the Plaintiff's past and future costs and damages in connection with investigating, treating, and remediating contamination at and emanating from the Adirondack Regional Airport, which is owned and operated by the Town and is located in Lake Clear, New York (a hamlet within the Town) to eliminate contamination caused and/or created by Defendants' actions or omissions, as well as protecting the public health, safety, welfare, and the environment; (II) recovery of Plaintiff's damages associated with the diminution of value of its property and other past and future damage; and (III) injunctive relief requiring Defendants to remediate the contamination.

## Jurisdiction and Venue

2.     Subject matter jurisdiction is proper in this Court pursuant to New York State

2

Constitution Article VI, § 7.

3.      Personal jurisdiction exists over each defendant pursuant to New York Civil Practice Law and Rules §§ 301, 302, 1501, New York Business Corporation Law § 1314 and other applicable law.

4.      Each of the Defendants are either registered to do business in the State of New York and/or have conducted substantial/regular business in the State of New York.  At all relevant times, Defendants manufactured, marketed, promoted, distributed, and/or sold: (i) aqueous film-forming foam ("AFFF") containing perfluorooctanoic acid ("PFOA"), perfluorooctane sulfonate ("PFOS"), other per- and polyfluoroalkyl substances ("PFAS"), and/or their precursors, or (ii) PFOA, PFOS, other PFAS, their precursors or other feedstocks/ingredients containing them used in AFFF ("AFFF Components").  These products were used and stored at the Airport (located in New York) and caused or substantially contributed to contamination, as well as the superfund designation, discussed below.

5.      Venue is proper in this Court because the actions/omissions of Defendants giving rise to the claims asserted herein occurred in Franklin County, have caused harm to Plaintiff, which is a municipality located within Franklin County, and/or all damages complained of herein occurred in Franklin County.

## Parties

6.      Plaintiff Town of Harrietstown New York is a municipality located in Franklin County New York.  Lake Clear, New York is a hamlet within the Town.  All wrongs discussed herein occurred within Town's jurisdiction.

7.      Plaintiff owns the land located at the Adirondack Regional Airport (the "Airport"), which is located in the Hamlet of Lake Clear.  The Airport's mailing address is 96 Airport Road,

3

Saranac Lake, New York 12983.

8.      The Town also owns various real properties surrounding the Airport.

9.      Plaintiff has owned and operated the Airport since approximately 1950.

10.      The Airport is a public use Airport of approximately 1,158 acres.

11.      Defendant 3M Company (f/k/a Minnesota Mining and Manufacturing Co.) is a Delaware corporation registered and authorized to do business in New York, with a principal place of business at 3M Center, St. Paul, Minnesota 55144.

12.      Defendant Tyco Fire Products L.P., is a Delaware limited partnership registered and authorized to do business in New York, with a principal place of business at 1400 Pennbrook Parkway, Lansdale, Pennsylvania 19446. Upon information and belief, Tyco is the successor-in-interest to Ansul, Inc.

13.      Defendant Buckeye Fire Equipment Company is an Ohio corporation, with a principal place of business at 110 Kings Road, Kings Mountain, North Carolina 28086.

14.      Defendant Chemguard, Inc. is a Texas corporation, with a principal place of business at 204 South 6th Avenue, Mansfield, Texas 76063 and/or One Stanton Street, Marinette, WI 54143.

15.      Defendant Raytheon Technologies Corp. (f/k/a United Technologies Corporation) is a Delaware corporation registered and authorized to do business in New York, with a principal place of business located at 10 Farm Springs Road, Farmington, Connecticut 06032.

16.      Defendant Kidde-Fenwal, Inc.is a Delaware corporation with its principal place of business at 400 Main St. Ashland, Massachusetts 01721.  Defendant Kidde-Fenwal, Inc. is the successor-in-interest to Kidde Fire Fighting, Inc. f/k/a Chubb National Foam, Inc. f/k/a National Foam System, Inc.

4

17.    Defendant Carrier Global Corporation is a Delaware corporation with a principal place of business of 13995 Pasteur Boulevard, Palm Beach Gardens, Florida 33418.  Carrier is the parent of Defendant Kidde.

18.    Defendant Dyneon LLC is a subsidiary of 3M and is a Delaware corporation.  It has a principal place of business of 6744 33rd St. N., Oakdale, Minnesota 55128.

19.    Defendant Amerex Corporation is an Alabama corporation with a principal place of business of 7595 Gadsden Highway, Trussville, Alabama 35173.

20.    Defendant National Foam, Inc. is a Delaware corporation, with a principal place of business at 141 Junny Road, Angier, North Carolina 27501.

21.    Defendant E.I. du Pont de Nemours and Company is a Delaware corporation with a principal place of business at 974 Centre Road, Wilmington, Delaware 19805 and is authorized and registered to do business in New York.

22.    Defendant The Chemours Company is a Delaware corporation with a principal place of business of 1007 Market Street, Wilmington, Delaware 19899 and is registered and authorized to do business in New York.

23.    Defendant The Chemours Company FC, LLC is a Delaware corporation with a principal place of business of 1007 Market Street, Wilmington, Delaware 19899 and is registered and authorized to do business in New York.

24.    In or around 2015, Dupont "spun off" its fluorochemical business to Chemours.  Upon information and belief, Chemours assumed certain environmental liabilities associated with DuPont's PFAS (including PFOA/PFOS) business.

25.    Defendant Corteva, Inc. is a Delaware corporation with a principal place of business of 974 Centre Road Wilmington, Delaware 19805 and is registered and authorized to do

5

business in New York. Corteva was formed via a variety of corporate restructuring transactions relating to Dupont whereby Corteva likely inherited Dupont's liabilities relating to PFAS as well as certain of Dupont's prior PFAS business lines.

26.     Defendant BASF Corporation is a Delaware corporation with a principal place of business of 100 Park Avenue, Florham Park, New Jersey 07932 and is registered and authorized to do business in New York.

27.     Defendant Dynax Corporation is a Delaware corporation with a principal place of business of 103 Fairview Park Dr., Elmsford, New York 10523 and is registered and authorized to do business in New York.

28.     Defendant Clariant Corporation is a New York corporation with a principal place of business of 4000 Monroe Road, Charlotte, North Carolina 28205 and is authorized and registered to do business in New York.

29.     Each of the AFFF Manufacturing Defendants developed, manufactured, distributed, supplied, marketed and/or sold AFFF containing PFOA, PFOS, their precursors and other PFAS in New York and resulted in such AFFF being stored and used at and around the Airport that contributed to the contamination at issue.

30.     Upon information and belief, AFFF Components developed, manufactured, distributed, marketed and sold by the Product Manufacturing Defendants were contained in the AFFF that caused the contamination at issue.

31.     The Unnamed Defendants are those unknown individuals or entities who designed, developed, manufactured, distributed, marketed, supplied, and/or sold AFFF Components or AFFF at and around the Airport and, as such, contributed to and/or was a substantial factor in causing the contamination at issue.

6

## Factual Background

### I.        PFAS Overview

32.    PFAS are a family of hundreds of man-made chemicals comprised of primarily carbon and fluorine.

33.    PFAS chemicals were invented in the 1930's.

34.    PFAS chemicals are effective in products requiring fire extinguishment and repellency of water, oil, and stains.

35.    PFOA and PFOS are the two most widely studied PFAS chemicals.

### II.        Biopersistent, Bioaccumulative and Toxic Effects of PFOA and PFOS

36.    PFOA and PFOS are man-made chemicals that do not exist naturally.

37.    PFOA and PFOS are biopersistent.

38.    PFOA and PFOS can persist in the environment for decades.

39.    PFOA and PFOS do not easily degrade.

40.    PFOA and PFOS readily move through soil, sand and water.

41.    PFOA and PFOS are highly soluble in water.

42.    PFOA and PFOS bioaccumulate in humans, animals, and fish.

43.    PFOA and PFOS biomagnify in humans, animals, and fish.

44.    PFOA and PFOS can accumulate through the food chain.

45.    PFOA and PFOS may accumulate in humans in the serum, kidney and liver.

46.    PFOA and PFOS have a lengthy half-life within the human body.

47.    PFOA and PFOS have been found to cross the placenta wall from pregnant mother to fetus.

48.    PFOA and PFOS can be transferred from mother to infant via breastmilk.

7

3:21-cv-00863-BKS Date Filed 03/15/21 Entry Number 1     Page 28 of 55

49.     The United States Environmental Protection Agency ("EPA") has found that PFOA and PFOS may cause harm to developing fetuses and breastfed infants via transmission from the mother.

50.     PFOA and PFOS are toxic at very low levels.

51.     Human exposure to PFOA and PFOS has been linked to several diseases including testicular cancer, kidney cancer, thyroid disease, ulcerative colitis, hypertension and other conditions.

52.     The full health risk and impacts of exposure to PFOA and PFOS are still being studied.

53.     Injuries associated with PFOA and PFOS are typically latent and may manifest years or decades after exposure.

54.     Studies have shown that approximately 99% of Americans have detectable levels of PFOA and/or PFOS in their blood.

55.     Studies have shown that virtually every baby born in America is born with a detectible level of PFOA and/or PFOS in his/her blood.

56.     There is no background or naturally occurring level of PFOA and/or PFOS as the chemicals are not natural and are man-made.

57.     No human had PFAS in their blood prior to the chemicals being invented.

58.     PFAS substances, and particularly PFOA and PFOS, have been detected ubiquitously throughout the world including as far as the Arctic.

59.     Due to the foregoing, the manufacture, import and use of PFOA and PFOS are restricted in the United States.

60.     In 2009, the Stockholm Convention on Persistent Organic Pollutants restricted

8

production and use of PFOS. In 2019, the Stockholm Convention on Persistent Organic Pollutants added PFOA to the list of substances to be eliminated from production and use.

61.     In 2016, PFOA and PFOS were added to New York State's list of hazardous substances.

62.     In 2016, EPA established a drinking water health advisory of seventy (70) parts per trillion of combined PFOA/PFOS.

63.     Certain states have promulgated advisory exposure levels lower than seventy (70) parts per trillion.

64.     In August 2020, New York State adopted a binding maximum contaminant level ("MCL") of 10 ppt each for PFOA and PFOS (the "MCLs")

65.     A MCL is the maximum level of a contaminant allowed in public drinking water, which, once established, creates a legally enforceable standard that requires applicable water systems to monitor, report findings and keep the contaminant below the level set.

66.     The MCLs are two of the lowest MCLs adopted in New York for any contaminant, evidencing the extraordinary toxicity of these compounds.

67.     In New York State, groundwater cleanup standards for a particular contaminant are set at the same level as an applicable MCL.

68.     In January 2021, the New York State Department of Environmental Conservation ("NYSDEC") published the revised *Sampling, Analysis, and Assessment of Per- and Polyfluoroalkyl Substances (PFAS)*. In that document, NYSDEC:

   a.  Stated that PFOA and PFOS should be further assessed and considered potential contaminants of concern in groundwater and surface water if PFOA or PFOS is detected in any groundwater or surface water sample at or above 10 ppt and is determined to be attributable to the site;

9

      b.   Provides that further assessment of water (ground or surface) may be warranted if either of the following screening levels are met: where any individual PFAS (not PFOA or PFOS) is detected in water (ground or surface) at or above 100 ppt or total concentration of PFAS (including PFOA and PFOS) is detected in water at or above 500 ppt, further assessment of such water may be warranted;

      c.   Adopted soil cleanup objectives for the protection of groundwater of 1.1 ppb and 3.7 ppb for PFOA and PFOS, respectively;

      d.   If PFOA and/or PFOS are identified as contaminants of concern for a site, they should be assessed as part of the superfund remedy selection process.

69.     In June 2018, the United States Department of Health and Human Services Agency for Toxic Substances and Disease Registry issued a draft report for public comment titled Toxicological Profile for Perfluoroalkyls (the "<u>ATSDR Report</u>").

70.     The ATSDR Report calculated minimal risk levels for, among other chemicals, PFOA and PFOS.

71.     The minimal risk level is "an estimate of the amount of a chemical a person can eat, drink, or breathe each day without a detectable risk to health."

72.     According to the Association of State Drinking Water Administrators, the minimal risk levels for PFOA and PFOS found in the ATSDR report equate to approximately eleven (11) parts per trillion for PFOA and seven (7) parts per trillion for PFOS, which are materially consistent with the MCLs.

**III.   <u>Environmental Impacts of PFOA/PFOS</u>**

73.     PFOA, PFOS and other PFAS contamination of environmental media (e.g. soil, groundwater, surface water, wildlife, and biota) is prevalent throughout the country.

74.     Airports are of particular concern for PFOA/PFOS and other PFAS contamination due to use and storage of AFFF at those facilities.

75.     Upon PFOA, PFOS or other PFAS coming into contact with soil, they migrate

10

downward through the soil until they reach the groundwater.

76.     PFOA, PFOS and other PFAS readily dissolve into groundwater.

77.     With its natural movement, the groundwater flows and, if contaminated with PFOA, PFOS and/or other PFAS, the groundwater carries PFOA, PFOS and/or other PFAS spreading the contamination over a wide area.

78.     Contaminated groundwater may flow into surface water bodies thereby contaminating those water bodies, and potentially wildlife and biota contained therein or surrounding.

## IV.     Manufacturers of PFOA/PFOS and Their Apparent Decades-Long Knowledge and Intentional Concealment of Dangers To Human Health and the Environment

79.     In the 1940's, 3M began manufacturing PFOA, PFOS and/or their precursors, as well as other PFAS.

80.     From no later than the 1950's through 2002, 3M was the primary manufacturer of PFOA and its precursors in the United States.

81.     From no later than the 1950's through 2002, 3M was the sole manufacturer of PFOS and its precursors in the United States.

82.     Upon information and belief, 3M made millions, if not billions, of dollars in profit from its production, distribution and sale of PFOA, PFOS and/or their precursors.

83.     Commencing in the 1950's, 3M began selling PFOA and/or its precursors to DuPont to enable DuPont to manufacture certain products, including products sold to AFFF Manufacturers to develop AFFF.

84.     Upon information and belief, 3M and Dupont made billions of dollars in profit from their products that contained PFOA, PFOS and/or their precursors, as well as other PFAS.

11

85.     As discussed fully below, 3M was the initial and primary manufacturer of AFFF, which for decades contained PFOA, PFOS, and/or their precursors, as well as other PFAS.

86.     Upon information and belief, by the end of the 1980's, certain Manufacturing Defendants, including, but not limited to, 3M and DuPont, were aware that PFAS materials, including PFOA and PFOS, had been detected in the blood of the general population of the United States, including people not known to be working at or living near facilities that manufacture PFAS suggesting that exposure resulted from use of products.

87.     By the end of the 1980's, certain Manufacturing Defendants, including but not limited to 3M and Dupont, conducted animal toxicity testing that indicated exposure to PFOA and/or PFOS resulted in various adverse health effects among multiple species of animals.

88.     Upon information and belief, those studies showed that exposure to PFOA and/or PFOS may cause a variety of cancers, birth defects and/or other illness.

89.     Upon information and belief, by the end of the 1980's, DuPont classified PFOA as a confirmed animal carcinogen and possible human carcinogen.

90.     By the end of the 1980's, certain, if not all, Manufacturing Defendants, including but not limited to 3M and Dupont, were aware that PFOA and/or PFOS were biopersistent when allowed to enter the environment unmitigated.

91.      By the end of the 1980's, certain, if not all, Manufacturing Defendants, including but not limited to 3M and Dupont, were aware that PFOA and PFOS bind to human and animal tissue, persist in human and animal bodies for years, and, accumulate in humans and animals that continue to be exposed.

92.     By the end of the 1980's, certain, if not all, Manufacturing Defendants, including but not limited to 3M and Dupont, were aware that PFOA and/or PFOS were detected throughout

12

the world.

93.     Upon information and belief, by the end of the 1980's, certain Manufacturing Defendants, including, but not limited to, 3M and DuPont, learned that PFOA and PFOS had the potential to pass the placenta wall, impact a fetus, and/or cause birth defects in humans and animals.

94.     Upon information and belief, by the end of the 1980's, female 3M employees of childbearing potential who were exposed to PFAS during their employ were moved to new roles in 3M as a result of these studies.

95.     Upon information and belief, after the 1980's, certain Manufacturing Defendants, including 3M and Dupont, conducted additional studies that confirmed the biopersistent, bioaccumulative, and toxic properties of PFOA and PFOS in humans and animals.

96.     Upon information and belief, studies conducted throughout the 1990's by certain Manufacturing Defendants, including 3M and Dupont, confirmed that exposure to PFOA and PFOS may cause various adverse human health impacts including an increased risk of cancer.

97.     Upon information and belief, in 1998, 3M, through an executive, told the EPA that 3M has no information suggesting that human health is at risk from exposure to PFOA and/or PFOS.

98.     Upon information and belief, from 1940 through at least 1998, the Manufacturing Defendants did not inform the appropriate governmental authorities, the public, or consumers of products containing PFOA and/or PFOS of the findings of the foregoing studies and other studies they completed.

99.     Upon information and belief, from 1940 through at least 1998, the Manufacturing Defendants did not inform or otherwise warn the appropriate governmental authorities, the public,

13

or consumers of products containing PFOA and/or PFOS, that PFOA and/or PFOS may be a latent toxic substance.

100.    Upon information and belief, from 1940 through at least 1998, the Manufacturing Defendants did not inform or otherwise warn the appropriate governmental authorities, the public, or consumers of products containing PFOA and/or PFOS, that PFOA and/or PFOS may be biopersistent.

101.    Upon information and belief, from 1940 through at least 1998, the Manufacturing Defendants did not inform or otherwise warn the appropriate governmental authorities, the public, or consumers of products containing PFOA and/or PFOS, that PFOA and/or PFOS may be bioaccumulative.

102.    In 2000, EPA issued an internal memorandum discussing the adverse impacts of PFOA and PFOS to human health and the environment citing that the chemicals are biopersistent, bioaccumulative in animals and humans, toxic, and may pose a long term risk to human health and the environment.

103.    In and/or shortly before 2000, EPA pressured 3M to phase out and/or cease producing PFOA and PFOS.

104.    In 2000, 3M, in response to pressure from EPA, finally announced that it would phase out production of PFOA and PFOS.

105.    On May 16, 2000, the United States and 3M Company publicly announced an agreement to phaseout PFOS from production because "these chemicals are very persistent in the environment, have a strong tendency to accumulate in human and animal tissues and could potentially pose a risk to human health and the environment over the long term."  The press release went on to state "PFOS chemicals are used to produce a range of products from fire-fighting foams

14

coatings for fabrics, leather, and some paper products, to industrial uses such as mist suppressants in acid baths."

106.    The press release received national news attention in the New York Times, among other media outlets.

107.    Despite the foregoing, in 2000, 3M issued a press release asserting that PFOA and PFOS are safe.

108.    In 2002, 3M substantially completed the phase out production of PFOA and PFOS.

109.    Despite 3M's substantial phase out of PFOA manufacturing, in 2002, DuPont opened a new manufacturing facility to take over manufacturing of PFOA and/or its precursors because production of those chemicals as well as products produced by DuPont that contained or were manufactured with the chemicals were so profitable.

110.    Upon information and belief, DuPont elected to open this facility to continue the production of PFOA and its precursors despite having apparent knowledge of the foregoing information.

111.    DuPont, 3M and the other Manufacturing Defendants have been named defendants in hundreds, if not, thousands of personal injury, property damage and cost recovery lawsuits throughout the country for their egregious conduct.

**V.    Manufacturers of AFFF**

112.    Upon information and belief, from at least the 1950's to 2002, Defendant 3M developed, designed, manufactured, marketed, sold and/or distributed PFOS, PFOA, their precursors and other applicable PFAS for use in, among other products, AFFF.

113.    Upon information and belief, 3M developed, designed, manufactured, marketed, sold and/or distributed AFFF Components to the AFFF Manufacturing Defendants for the AFFF

15

Manufacturing Defendants' use as an ingredient in AFFF.

114.    Upon information and belief, Defendant 3M developed, designed, manufactured, marketed, sold and/or distributed AFFF containing PFOA, PFOS, and/or their precursors, as well as other PFAS beginning in the 1950's through approximately 2002.

115.    Each of the other AFFF Manufacturing Defendants developed, designed, manufactured, marketed, sold and/or distributed AFFF containing PFOA, PFOS, and/or their precursors as well as other PFAS for decades and during relevant times.

116.    Upon information and belief, the AFFF Manufacturing Defendants knew, or should have known, that PFOA, PFOS and/or their precursors, as well as other PFAS were contained in their AFFF products.

117.    Upon information and belief, during all relevant times, the Product Manufacturing Defendants developed, designed, manufactured, marketed, sold and/or distributed AFFF Components to the AFFF Manufacturing Defendants for the AFFF Manufacturing Defendants' use in the production of AFFF.

118.    Upon information and belief, the Product Manufacturing Defendants knew, or should have known, that the AFFF Components they produced, distributed and sold to the AFFF Manufacturing Defendants would cause AFFF to contain PFOA, PFOS, their precursors and other PFAS.

119.    Upon information and belief, the Defendants knew, or should have known, of the risks of PFOA, PFOS and other PFAS to human health and the environment when manufacturing, marketing, selling and distributing their products.

120.    Upon information and belief, the Defendants, despite having such knowledge, failed to timely inform the EPA, other applicable government agencies, or the public of the

16

information they possessed related to risks to human health and the environment of AFFF containing PFOA, PFOS and/or their precursors as well as other PFAS and continued to manufacture, market, sell and distribute AFFF with such knowledge.

121. Upon information and belief, the Defendants, despite having such knowledge, failed to adequately warn AFFF end-users, including the Town, of the potential hazards to human health and the environment and provide ways to mitigate such hazards by, for example: (i) excavating soil contacted with AFFF, or (ii) placing a containment liner down where AFFF was used for training, AFFF was stored or AFFF equipment was washed.

122. Upon information and belief, the Defendants, despite having such knowledge, failed to adequately provide AFFF end-users, including the Town, with best management practices sufficiently designed to minimize health and environmental risks during all relevant times.

123. While AFFF Manufacturing Defendants have changed their AFFF formulas, AFFF produced by AFFF Manufacturing Defendants containing PFOA/PFOS and/or their precursors, as well as other PFAS remains stored on shelves and may continue to be used into the foreseeable future.

124. Upon information and belief, AFFF Manufacturing Defendants have not recalled their produced AFFF containing PFOA, PFOS, or their precursors that remains stored and/or on the shelves today.

125. During all relevant times, reasonable and safer alternatives were available to produce AFFF, or an effective sister product, without PFOA, PFOS, their precursors, and/or certain other PFAS particularly for use in training operations and extinguishment of certain fires.

17

## VI.    Introduction of PFOA and PFOS to Environmental Media At the Airport

126.    PFOA, PFOS, their precursors and other PFAS are, or have been, contained in AFFF.

127.    AFFF has been used for decades to extinguish flammable liquid fires and for training.

128.    AFFF concentrate is mixed with water to make a liquid foam which is aerated and applied to fire suffocating the fire of oxygen and thereby extinguishing it.

129.    Upon AFFF being sprayed in accordance with its intended use and per AFFF Manufacturing Defendants' instructions, the AFFF material contacts the ground and PFOA, PFOS, other PFAS and/or their precursors enter the soil.

130.    The PFOA, PFOS, their precursors and other PFAS then migrate through the soil to the groundwater below causing PFAS contamination.

131.    AFFF has been stored and used at, among other places, airports throughout the country, including the Town's Airport from approximately 1960 forward.

132.    AFFF Manufacturing Defendants designed, manufactured, distributed, marketed, supplied and/or sold AFFF used and stored at the Airport.

133.    Town purchased AFFF produced by certain of the Defendants, including but not limited to, Defendant 3M and Defendant Chemguard.

134.    Product Manufacturing Defendants designed, manufactured, distributed, marketed, supplied and/or sold AFFF Components that the AFFF Manufacturing Defendants used to make the AFFF that was used and/or stored at the Airport.

135.    Throughout the time AFFF containing PFOA, PFOS, PFAS, and/or their precursors was used and stored at the Airport, warning labels, manuals, and safety information

18

3:21-cv-00863-BKS Broome Filed 03/15/21 Entry Number 1    Page 39 of 55

provided with AFFF did not provide notification of the environmental and health perils of which the Manufacturing Defendants knew, or should have known, existed.

136.    Defendants failed to warn end users, including the Town, that unmitigated releases of AFFF were likely to cause environmental harm.

137.    Defendants failed to instruct end-users, including the Town to: (i) excavate soil that has come in contact with AFFF, or (ii) place a liner on the ground to prevent migration of contaminants before AFFF use or to contain leakage storage or washing of equipment.

138.    AFFF was stored at the Airport and used for actual firefighting/crash response and firefighting training drills for decades.

139.    Use and storage of AFFF produced by the AFFF Manufacturing Defendants has caused contamination of environmental media, including soil, groundwater, surface water, wildlife and biota, at and around the Airport.

140.    PFAS, including PFOA and PFOS, has been detected in groundwater and surface water at and around the Airport.

141.    As PFOA, PFOS and likely other PFAS at issue are biopersistent, it is expected that the contaminated environmental media will remain contaminated for decades absent active remediation.

**VII.    NYSDEC's Detection of PFAS in Environmental Media at and around the Airport**

142.    NYSDEC, through its contractor TRC Engineers, Inc., conducted subsurface and surface water sampling at the Airport in August 2018.  The sampling results and finding of NYSDEC were released in a Site Characterization Report for the Airport in March 2019.

143.    The NYSDEC report reveals NYSDEC's determination that PFOA, PFOS and

19

other PFAS are present in: (i) the groundwater at, and likely around, the Airport, and (ii) surface water bodies immediately adjacent to the Airport.

144.     In groundwater, NYSDEC detected PFOS and PFOA at levels up to 18,000 ppt and 91 ppt, respectively, or 1,800 and 9.1 times groundwater cleanup standards.

145.     In surface water, NYSDEC detected PFOS and PFOA at levels up to 990 ppt and 9.3 ppt, respectively.

146.     Several other PFAS chemicals were detected in groundwater and surface water including, perfluorohexanesulfonic acid ("PFHxS") a PFAS chemical also contained in AFFF, up to 8,300 ppt in groundwater and 250 ppt in surface water.

147.     According to NYSDEC-

> Significant portions of the undeveloped land immediately surrounding the Site are mapped wetlands and contain several small unnamed streams, tributaries, drainage ditches, ponds, etc. Fay Brook is a "protected stream" designated as Class C (T) waters, is located approximately 1,250 feet east of the site. Lake Clear, a "protected stream" designated as Class AA (T) waters, is approximately 3,650 feet west of the Site. No direct tributaries to Lake Clear have been identified at the Site.

148.     Due to these detections, it is likely that contaminated groundwater has migrated offsite and has impacted surface water bodies, wildlife and biota.  In addition, it is highly likely that soil at the Airport is impacted.

149.     The NYSDEC investigation report reveals that AFFF use at the Airport constitutes the likely source of the PFAS contamination (including PFOA and PFOS) found in the environmental media.

20

## VIII.   NYSDEC Designates the Airport as a Superfund Site

150.    In October 2020, NYSDEC issued a Public Notice designating the entirety of the 1,158 acre Airport as a Class 2 Inactive Hazardous Waste Site due to the detection of PFAS (including PFOA and PFOS) in groundwater and surface water via the Site Characterization.

151.    The Class 2 designation means that "the disposal of hazardous waste has been confirmed and the presence of such hazardous waste or its components or breakdown products represents a significant threat to public health or the environment."

152.    The superfund site designation requires the full nature and extent of the contamination both at the Airport and emanating therefrom to be investigated and remediated at a significant cost to the Town.

153.    As a result of the superfund site designation, NYSDEC has demanded, and is requiring pursuant to the New York Environmental Conservation Law ("ECL") and applicable NYSDEC regulations, that the Town, *inter alia*: (i) pay or reimburse New York State's past and future costs associated with NYSDEC's site characterization (SC) and future costs associated with the investigation and remediation of the Airport and contamination emanating therefrom, and/or, (ii) conduct and pay for a Remedial Investigation (RI), Feasibility Study (FS) and remediation of the contamination at and emanating from the Airport under NYSDEC oversight.

154.    As stated above, PFOA, PFOS and likely other PFAS do not degrade in the environment meaning contamination will persist without active remediation.

155.    It is expected that NYSDEC will require significant and active remediation at the Airport and contamination emanating therefrom, including impacted surface water bodies.

21

IX.     **The Town's Properties Are Significantly Depreciated Due to the Superfund Designation**

156.    The Town owns the land that comprises the Airport, which consists of approximately 1,158 acres.

157.    The Town also owns properties surrounding the airport.

158.    The superfund site designation and the contamination referenced herein, which has been reported by various media outlets, renders the entire Airport and immediately adjacent land owned by the Town significantly depreciated due to liability concerns and stigma, among other reasons.

## CAUSES OF ACTION

### First Cause of Action Against All Defendants
(Negligence)

159.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully stated herein.

160.    Defendants owed a duty of care to Plaintiff to not design, develop, manufacture, distribute, market, supply, and sell AFFF and AFFF Components that were likely to contaminate environmental media at and around the Airport.

161.    Defendants breached their duties by negligently designing, developing, manufacturing, distributing, marketing, supplying, and/or selling AFFF and/or AFFF Components, which were used at and around the Airport.

162.    Alternatively, Defendants owed a duty of care to Plaintiff to immediately warn Plaintiff that the storage, use or washing of AFFF or AFFF equipment or otherwise failing to contain releases of AFFF were likely to latently contaminate environmental media, including soil, groundwater and surface water.

22

163.    Defendants breached their duties by failing to warn Plaintiff that the use and/or storage of AFFF was likely to latently contaminate environmental media at and around the Airport.

164.    Defendants' breaches are the actual cause or substantial factor of: (i) contamination of the environmental media at and around the Airport, (ii) endangerment to the environment and human health described herein, and (iii) damages suffered by Plaintiff set forth herein.

165.    Defendants' breaches are the proximate cause of: (i) contamination of the environmental media at and around the Airport, (ii) endangerment to the environment and human health described herein, and (iii) damages suffered by Plaintiff set forth herein.

166.    Upon information and belief, Defendants knew or should have known that their acts were probable to cause injury to the environment and human health in the manner complained herein.  Defendants acted with knowledge, intent, fraud and/or malice driven by their own motives to profit from their products with conscious disregard for public health and the environment.

167.    As a result of the foregoing, Defendants are jointly and severally liable to the Plaintiff in an amount to be proven at trial for: (I) actual, direct, indirect, incidental and consequential compensatory damages for diminution of the value of Plaintiff's properties and other past and future damage, including Plaintiff's costs associated with investigating and remediating impacted environmental media at and around the Airport; (II) natural resource damages for damage to the environmental media located at and around the Airport; (III) injunctive relief requiring and directing Defendants to restore, or otherwise pay for the restoration of, all environmental media at and around the Airport, and (IV) for such other, further, and different relief as the Court deems just and proper including punitive damages, pre- and post- judgment interest, costs, and attorneys' fees.

23

## Second Cause of Action Against All Defendants
### (Strict Liability - Ultra Hazardous Activity)

168.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully stated herein.

169.    Defendants' design, development, manufacturing, distribution, marketing, supply, and sale of AFFF Components and AFFF, which was used at and around the Airport, in an unremediated, unmonitored, unreported and unsecured condition constitutes ultrahazardous activity.

170.    Defendants' design, development, manufacturing, distribution, marketing, supply, and sale of AFFF Components and AFFF: (i) created a high risk of harm to others, including the Town, (ii) created a likelihood that the harm resulting from these activities would be great, (iii) presented the inability to eliminate the risk by the exercise of reasonable care, (iv) were not a matter of common usage as such products contained dangerous latent chemicals, (v) were inappropriate to the place carried on at and around the Airport, which overlies groundwater and is nearby several surface water bodies, and/or (vi) the value to the community did not outweigh its dangerous attributes.

171.    As a result of these ultrahazardous activities, Defendants have and had a duty, including an absolute duty to Plaintiff.

172.    As a result of these ultrahazardous activities, PFOA, PFOS and other PFAS were released into the environment at and around the Airport causing harm to Plaintiff and the environment.

173.    Each Defendant's conduct actually caused and/or was a substantial factor in causing: (i) contamination of the environmental media at and around the Airport, (ii)

24

contamination of surface water bodies near the Airport, (iii) endangerment to the environment and human health described herein, and (iv) damages suffered by Plaintiff set forth herein.

174.    Each Defendant's conduct is the proximate cause of the: (i) contamination of the environmental media at and around the Airport, (ii) contamination of surface water bodies near the Airport, (iii) endangerment to the environment and human health described herein, and (iv) damages suffered by Plaintiff set forth herein.

175.    The harm suffered by Plaintiff is precisely the kind of harm that made the Defendants' activities ultrahazardous.

176.    Upon information and belief, Defendants knew or should have known that their design, development, manufacturing, distribution, marketing, supply, sale and/or failure to warn were probable to cause injury to the environment and human health in the manner complained herein.  Defendants acted with knowledge, intent, fraud and/or malice driven by their own motives to profit from their products with conscious disregard for public health and the environment.

177.    As a result of the foregoing, Defendants are jointly and severally liable to the Plaintiff in an amount to be proven at trial for: (I) actual, direct, indirect, incidental and consequential compensatory damages for diminution of the value of Plaintiff's properties and other past and future damage, including Plaintiff's costs associated with investigating and remediating impacted environmental media at and around the Airport; (II) natural resource damages for damage to the environmental media located at and around the Airport; (III) injunctive relief requiring and directing Defendants to restore, or otherwise pay for the restoration of, all environmental media at and around the Airport, and (IV) for such other, further, and different relief as the Court deems just and proper including punitive damages, pre- and post- judgment interest, costs, and attorneys' fees.

25

### Third Cause of Action Against All Defendants
### (Strict Liability - Defective Design)

178.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully stated herein.

179.    Defendants designed, manufactured, distributed, marketed, supplied and/or sold AFFF Components and/or AFFF that was used and stored at the Airport.

180.    Defendants placed such products into the stream of commerce.

181.    During all relevant times, AFFF presented latent dangers such that a reasonable consumer, purchaser or end-user, including the Town, would not be aware of such dangers.

182.    AFFF was not reasonably safe in its design.

183.    Feasible and safer alternatives to AFFF containing PFOA, PFOS, their precursors and certain PFAS existed during relevant times including for the uses that occurred at the Airport.

184.    Defendants failed to adopt these alternative designs.

185.    AFFF was used in accordance with the foreseeable and intended uses at and around the Airport.  AFFF use and storage is the actual cause or substantial factor of: (i) contamination of the environmental media at and around the Airport, (ii) contamination of surface water bodies near the Airport, (iii) endangerment to the environment and human health described herein, and (iv) damages suffered by Plaintiff set forth herein.

186.    AFFF was used in accordance with their foreseeable or intended uses at and around the Airport and is the proximate cause of: (i) contamination of the environmental media at and around the Airport, (ii) contamination of surface water bodies around the Airport, (iii) endangerment to the environment and human health described herein, and (iv) damages suffered by Plaintiff set forth herein.

26

187.    Upon information and belief, Defendants knew or should have known that their products would cause injury to the environment and human health in the manner complained herein. Defendants acted with knowledge, intent, fraud and/or malice driven by their own motives to profit from their products with conscious disregard for public health and the environment.

188.    As a result of the foregoing, Defendants are jointly and severally liable to the Plaintiff in an amount to be proven at trial for: (I) actual, direct, indirect, incidental and consequential compensatory damages for diminution of the value of Plaintiff's properties and other past and future damage, including Plaintiff's costs associated with investigating and remediating impacted environmental media at and around the Airport; (II) natural resource damages for damage to the environmental media located at and around the Airport; (III) injunctive relief requiring and directing Defendants to restore, or otherwise pay for the restoration of, all environmental media at and around the Airport, and (IV) for such other, further, and different relief as the Court deems just and proper including punitive damages, pre- and post- judgment interest, costs, and attorneys' fees.

### Fourth Cause of Action Against All Defendants
### (Strict Products Liability  - Failure to Warn)

189.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully stated herein.

190.    Defendants were designers, manufacturers, distributers, marketers, suppliers, and/or sellers of AFFF Components and AFFF that was used and stored at the Airport.

191.    Defendants had a duty to warn against latent dangers resulting from the intended or foreseeable uses of their products that Defendant knew or should have known existed.

192.    The intended or foreseeable uses of AFFF presented latent dangers.

27

193.  Defendants knew or should have known of these latent dangers.

194.  Defendants failed to warn users of the latent dangers associated with AFFF, including those who used and stored such products at and around the Airport.

195.  Defendants' failure to warn is the actual cause or substantial factor of: (i) contamination of the environmental media at and around the Airport, (ii) contamination of surface water bodies near the Airport, (iii) endangerment to the environment and human health described herein, and (iv) damages suffered by Plaintiff set forth herein.

196.  Defendants' failure to warn is the proximate cause of: (i) contamination of the environmental media at and around the Airport, (ii) contamination of surface water bodies at and around the Airport, (iii) endangerment to the environment and human health described herein, and (iv) damages suffered by Plaintiff set forth herein.

197.  Upon information and belief, Defendants knew or should have known that their failure to warn would cause injury to the environment and human health in the manner complained herein.  Manufacturing Defendants acted with knowledge, intent, fraud and/or malice driven by their own motives to profit from their products with conscious disregard for public health and the environment.

198.  As a result of the foregoing, Defendants are jointly and severally liable to the Plaintiff in an amount to be proven at trial for: (I) actual, direct, indirect, incidental and consequential compensatory damages for diminution of the value of Plaintiff's properties and other past and future damage, including Plaintiff's costs associated with investigating and remediating impacted environmental media at and around the Airport; (II) natural resource damages for damage to the environmental media located at and around the Airport; (III) injunctive relief requiring and directing Defendants to restore, or otherwise pay for the restoration of, all

28

environmental media at and around the Airport, and (IV) for such other, further, and different relief as the Court deems just and proper including punitive damages, pre- and post- judgment interest, costs, and attorneys' fees.

### Fifth Cause of Action Against All Defendants
### (Public Nuisance)

199.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully stated herein.

200.    The Town's properties, including the Airport, the groundwater, and nearby surface water bodies which are now contaminated, benefit the public.

201.    The negligent, reckless, and/or intentional activity of the Defendants, as alleged herein, has created, contributed to, caused and/or maintained contamination of the environmental media at and around the Airport.

202.    The contamination of the environmental media created, contributed and/or maintained by Defendants constitutes a substantial interference with a right common to the public that offends public morals, interferes with or causes damage to the public's right to use the groundwater, surface water bodies and other environmental media, and/or endangers or injures the property, health, safety or comfort of the Town.

203.    Upon information and belief, Defendants knew or should have known that their design, development, manufacturing, distribution, marketing, supply, sale and/or failure to warn were probable to cause injury to the environment, property, and human health in the manner complained herein.  Defendants acted with knowledge, intent, fraud and/or malice driven by their own motives to profit from their products with conscious disregard for public health and the environment.

29

204.  Each Defendant is a substantial factor in bringing about the contamination of the environmental media at and around the Airport, and each Defendant is jointly responsible for the injuries and damage caused to Plaintiff.

205.  As a result of the foregoing, Defendants are jointly and severally liable to the Plaintiff in an amount to be proven at trial for: (I) actual, direct, indirect, incidental and consequential compensatory damages for diminution of the value of Plaintiff's properties and other past and future damage, including Plaintiff's costs associated with investigating and remediating impacted environmental media at and around the Airport; (II) natural resource damages for damage to the environmental media located at and around the Airport; (III) injunctive relief requiring and directing Defendants to restore, or otherwise pay for the restoration of, all environmental media at and around the Airport, and (IV) for such other, further, and different relief as the Court deems just and proper including punitive damages, pre- and post- judgment interest, costs, and attorneys' fees.

### Sixth Cause of Action Against All Defendants
#### (Trespass)

206.  Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully stated herein.

207.  Plaintiff did not give Defendants authority to cause PFOA, PFOS or other PFAS to enter the environmental media on property it owns at and around the Airport.

208.  Upon information and belief, Defendants knew or should have known that their design, development, manufacturing, distribution, marketing, supply, sale, and/or failure to warn were probable to cause such contamination of environmental media at and around the Airport and otherwise result in the Airport being designated as a superfund site.

30

209. Defendants' willful conduct resulted in PFOA, PFOS and other PFAS intruding into environmental media at and around the Airport without authorization.

210. Defendants' actions or omissions are the actual cause or substantial factor of: (i) contamination of the environmental media at and around the Airport, (ii) contamination of the surface water bodies around the Airport, (iii) endangerment to the environment and human health described herein, and (iv) damages suffered by Plaintiff set forth herein.

211. Defendants' actions or omissions are the proximate cause of: (i) contamination of the environmental media at and around the Airport, (ii) contamination of surface water bodies around the Airport, (iii) endangerment to the environment and human health described herein, and (iv) damages suffered by Plaintiff set forth herein.

212. Upon information and belief, Defendants knew or should have known that their design, development, manufacturing, distribution, marketing, supply, sale and/or failure to warn were probable to cause injury to the environment and human health in the manner complained herein. Defendants acted with knowledge, intent, fraud and/or malice driven by their own motives to profit from their products with conscious disregard for public health and the environment.

213. As a result of the foregoing, Defendants are jointly and severally liable to the Plaintiff in an amount to be proven at trial for: (I) actual, direct, indirect, incidental and consequential compensatory damages for diminution of the value of Plaintiff's properties and other past and future damage, including Plaintiff's costs associated with investigating and remediating impacted environmental media at and around the Airport; (II) natural resource damages for damage to the environmental media located at and around the Airport; (III) injunctive relief requiring and directing Defendants to restore, or otherwise pay for the restoration of, all environmental media at and around the Airport, and (IV) for such other, further, and different

31

relief as the Court deems just and proper including punitive damages, pre- and post- judgment interest, costs, and attorneys' fees.

### Seventh Cause of Action Against All Defendants
### (Restitution/Unjust Enrichment)

214.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully stated herein.

215.    Manufacturing Defendants made millions, if not billions, in profit from design, development, manufacturing, distribution, marketing, supply, and sale, of AFFF Components and AFFF.

216.    PFOA, PFOS and other PFAS have contaminated environmental media at and around the Airport.

217.    It would be against equity and good conscience to permit Defendants to pass to Plaintiff the financial burden of: (i) diminution of Plaintiff's properties and other past and future damage, and (ii) investigating and remediating contamination at and emanating from the Airport as a result of Defendants' actions.

218.    Defendants must make restitution to Plaintiff for all of Plaintiff's prior, current and future associated expenses, costs and damages, including interest, attorneys' fees and costs.

### Eighth Cause of Action Against All Defendants
### (Contribution)

219.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully stated herein.

220.    NYSDEC is requiring Town to investigate and remediate the contamination at and around the Airport, or otherwise reimburse New York State for such costs.

221.    Defendants owed a duty of care to the State of New York not to design, develop,

32

manufacture, distribute, market, supply, and/or sell AFFF Components or AFFF for use/storage at the Airport that was likely to contaminate environmental media at and around the Airport.

222.    Defendants breached their duties by designing, developing, manufacturing, distributing, marketing, suppling, and/or selling AFFF Components or AFFF for use at the Airport.

223.    Defendants' breaches actually caused, had a part in causing, were a substantial factor in causing, contributed to, and/or proximately caused the PFOA, PFOS and other PFAS contamination found at and around the Airport and the designation of the Airport as a superfund site.

224.    To the extent Plaintiff is found liable to NYSDEC or New York State, or otherwise receives a demand by New York State to reimburse the State for its costs, Defendants shall be deemed liable in an amount to be proven at trial for their apportionment of fault.

**WHEREFORE,** plaintiff Town of Harrietstown requests judgment in its favor and against Defendants as follows:

i.    Actual, direct, indirect, incidental and consequential compensatory damages, in an amount to be proven at trial, for diminution of the value of Plaintiff's properties and other past and future damage, including Plaintiff's costs associated with, among other things, investigating and remediating contamination at and emanating from the Airport;

ii.    Natural resource damages, in an amount to be proven at trial, for damage to the environmental media located at and around the Airport;

iii.    To the extent money damages are inadequate, injunctive relief requiring and directing Defendants to restore, or otherwise pay for the restoration of, all environmental media at and around the Airport;

33

      iv.      All appropriate declaratory relief;

      v.      Against Defendants to the extent Plaintiff is found liable to New York State or NYSDEC, or otherwise receives, or has received, a demand from the State (including NYSDEC and/or the New York State Department of Health) for reimbursement of the State's cost, for contribution of such award;

      vi.      Awarding punitive damages in a sum to be determined at trial;

      vii.      Awarding pre- and post-judgment interest, with costs and disbursements

      viii.      Awarding attorneys' fees related to the prosecution of the instant action, and

      ix.      Awarding such other, further and different relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury as to all issues.

Dated:  January 28, 2021
       Melville, New York

Respectfully submitted,

**RIGANO LLC**
*Attorneys for Town of Harrietstown, New York*

By: *\/s\/ Nicholas C. Rigano*
     James P. Rigano, Esq.
     Nicholas C. Rigano, Esq.
     538 Broad Hollow Road, Suite 301
     Melville, New York 11747
     (631) 756-5900
     nrigano@riganollc.com

34

## VERIFICATION

I, James P. Rigano, am an attorney duly admitted to practice law in the Courts of this State, and I affirm the following under penalties of perjury:

I am the attorney for Plaintiff in the above-entitled action. I have read the foregoing Summons and Verified Complaint and know the contents thereof, and upon information and belief, believe after an inquiry reasonable under the circumstances, the matters alleged therein to be true, and that the contentions therein are not frivolous, as that term is defined in 22 NYCRRR § 130-1.1(c).

The reason this verification is made by affirmant and not by Plaintiff is that the Plaintiff herein is not located in a County where my firm maintains an office.

The source of affirmant's information and the grounds of his/her belief are communications, papers, reports and investigations contained in the file maintained by this office.

Dated: Melville, New York
January 28, 2021

James P. Rigano, Esq.

Notary Signature

```
LISA CAMPANILE
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01CA6271949
SUFFOLK
Commission Expires November 13, 2024
```

35